**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**CARLTON S.**

**Plaintiff,** **25-CV-00714-HKS**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

## DECISION AND ORDER

As set forth in the Standing Order of the Court regarding Social Security Cases subject to the May 21, 2018 Memorandum of Understanding, the parties have consented to the assignment of this case to the undersigned to conduct all proceedings, including the entry of final judgment, as set forth in 42 U.S.C. § 405(g). Dkt. #11.

## BACKGROUND[1]

On February 6, 2020, plaintiff, at the age of 53, filed an application for Title XVI supplemental security income, alleging a disability onset date of April 1, 2018. Dkt. #3, pp. 107-112.

In a Disability Report filed on March 17, 2020, plaintiff alleged he was disabled due to traumatic brain injury, seizures, anxiety, and depression. Dkt. #3, p. 242.

[1] Record citations use the page number(s) generated by the Court's electronic filing system.

Plaintiff's claim was denied initially and on reconsideration. Dkt. #3, pp. 86, 106. Plaintiff requested a hearing, and a telephone hearing before Administrative Law Judge ("ALJ") Linda S. Harris Crovella was held on March 16, 2022. Dkt. #3, pp. 39-71.

The ALJ issued an unfavorable decision on March 30, 2022, Dkt. #3, pp. 18-38, and plaintiff requested review by the Appeals Council. On May 26, 2023, the Appeals Council denied review. Dkt. #3, pp. 7-12. Plaintiff appealed to this Court, and on December 26, 2023, the Commissioner filed an unopposed motion for remand on the grounds that the ALJ's decision did not contain an adequate consideration of the medical source opinions and prior administrative filings. Dkt. #3, pp. 920-921. This Court granted that motion, and the matter was remanded to the Appeals Council. Dkt. #3, p. 922.

On remand, the Appeals Council sent the case back to an ALJ with the instruction to re-evaluate the medical evidence. Dkt. #3, pp. 923-928.

On February 24, 2025, ALJ William M. Weir held another telephone hearing. Dkt. #3, pp. 869-892. Plaintiff appeared with his counsel.

The ALJ first questioned a medical expert ("ME"), James Haynes ("Dr. Haynes"). The ALJ asked Dr. Haynes, based on his review of the file, what diagnoses he would make of plaintiff and whether there were any functional limitations that meet or medically equal a listing. Dkt. #3, p. 875. Dr. Haynes testified that plaintiff had suffered two head injuries, one when he hit his head on a front loader many years ago and one on

a ski lift, and that he developed seizures and headaches as a result. *Id.* Dr. Haynes noted that the neurological records suggest that there may be some psychological component to the seizures; that a record from February 2020 stated that plaintiff had had ten seizures in six years; and that his headaches were intermittent. *Id.* Dr. Haynes also noted that there was a gap between 2020 and 2024 when plaintiff did not follow up with his neurologist. *Id.*

Dr. Haynes testified that, based on the records, plaintiff's headaches appear to be stable and do not meet a listing. *Id.* at 876. As to the seizures, he testified that limitations would be no commercial driving, no power tools, no heavy machinery, no heights, and no kitchen work. *Id.*

Plaintiff's counsel then asked Dr. Haynes whether a person with these conditions would have days when they could not work at all. Dr. Haynes testified that he could not really say since the symptoms are variable, but if the person had a major seizure, he could be out for two to three days. *Id.* at 876-877.

Counsel then asked Dr. Haynes if there was a connection between seizure activity and stress, and Dr. Haynes stated, "not really" and that most people are able to control their seizures with medication. *Id.* at 878.

Next, plaintiff's counsel asked plaintiff if he was still struggling with headaches, and plaintiff testified that he was. *Id.* He testified that he gets them once or

twice a week, and they are located over his left ear where he was injured. *Id.* at 879. They begin with a throbbing pain that intensifies such that he cannot concentrate; he must lie down; noise, light, and sound all hurt; and the headaches are debilitating. *Id.*[2]

Plaintiff also testified that stress or anxiety, such as loud noises, screaming, or yelling, will trigger a headache. *Id.* He also testified that his memory is "shot," and that he forgets to take his medications, he can forget what day it is, and he gets confused and loses sleep. *Id.* at 880.

Plaintiff next testified that it had been three or four months since he had a seizure. *Id.* When he has a seizure, he falls down, and during the last one, he fell on concrete and knocked out his front teeth. *Id.* He testified that after he has a seizure, he feels like he has been beaten up, and his muscles ache, which can last minutes or hours depending on the severity of the seizure. *Id.* at 881.

Plaintiff's counsel next asked plaintiff about his anxiety, and plaintiff testified that he has anxiety and panic attacks all the time. *Id.* It is affecting his life, and he testified that he is becoming a recluse because he does not want to open the door because he fears what might be on the other side. *Id.*

---

[2] In the March 2022 hearing, plaintiff testified that his headaches had improved with medication, but he still has headaches every day and some are intolerable. Dkt. #3, p. 941. The intolerable headaches occur one to three times a week and last from five minutes to two hours. Dkt. #3, pp. 941-942. Normally, he will sit in a very quiet, dark location to try to make them go away. Dkt. #3, p. 942. Sometimes when he has a headache, he cannot remember things and focus. Dkt. #3, pp. 944-945.

Plaintiff testified that he has panic attacks four to eight times a month, depending on how stressful it is. *Id.* at 882. He testified that he had an attack that morning waiting for the hearing phone call. *Id.* After a panic attack, he has to sit and regather his thoughts, and his day is pretty much "shot." *Id.*

Upon examination by the ALJ, plaintiff testified that he takes a generic version of Depakote for his headaches. *Id.* at 883. He also testified that he sometimes wakes up with a headache and seizes in his sleep. *Id.* at 884. After he fell and knocked out his teeth, he did not have them repaired because he does not like dentists. *Id.*

The ALJ asked plaintiff's counsel whether there was evidence in the file of formal memory testing, and counsel said he did not think so. *Id.* at 885.

Next, the ALJ heard from vocational expert ("VE"), Dawn Blythe. The ALJ noted that the VE's resume was in the record, which indicates that she has a Bachelor's degree in Psychology, a Master's of Science in Rehabilitation Counseling, and over twenty-five years' experience in vocational counseling and consulting. Dkt. #4, pp. 55-57. Plaintiff's counsel indicated that he had no foundational objections to the VE. Dkt. #3, p. 885.

The VE first noted that plaintiff had past work as a ski lift attendant, with an SVP of 3 and a light exertional level, as well work as a janitor, also an SVP of 3, with an exertional level of medium but heavy as performed. *Id.* at 886-887.

The ALJ asked the VE to assume a person with plaintiff's vocational profile who has no exertional limitations and should not work at unprotected heights or around dangerous machinery, tools, or chemicals. *Id.* at 887. Further, the person should not drive or work in a kitchen as part of their essential work functions; they may not work above shoulder level with the right hand and arm but may do so with the left arm; and there are no reaching limits bilaterally below the shoulder level. *Id.* Also, the person should not work in an environment with loud noises, yelling, or higher-level conflict. *Id.*

The ALJ asked the VE whether, with those limitations, plaintiff's past jobs were available, and she said no. *Id.* The ALJ then asked if other jobs were available, and the VE identified routing clerk—117,393 jobs—and cashier II—467,033 jobs—both with light exertion levels. *Id.* at 887-888. The VE noted that the Dictionary of Occupational Titles ("DOT") does not address specific above-shoulder work, and that her testimony was based on her training and experience as to the use of one arm or the other. *Id.* at 888.

The ALJ asked the VE how she derived the number of jobs available, and she stated that she used a software program called Job Browser Pro, which obtains numbers from the Department of Labor's Bureau of Statistics. *Id.* She stated that she uses DOT-specific numbers for full-time jobs and does not manipulate the numbers. *Id.* She also testified that these sources are customarily used by VEs and that the definitions in them are not different from others used in social security rulings ("SSRs"). She also

confirmed that her testimony was otherwise consistent with the DOT. *Id.* Finally, the VE testified that the routing clerk and cashier II jobs are moderately[3] performed consistent with the DOT.

Plaintiff's counsel then asked the VE if those two jobs would be available if the person was limited to standing no more than six hours out of an eight-hour day, and she stated that based on her experience they would be, but she would reduce the job numbers by 50%. *Id.* at 888-889.

Plaintiff's counsel then asked the VE what the tolerance for absenteeism is generally in the national economy, and she said no more than one missed day a month, which includes arriving late or leaving early. *Id.* at 889. She also testified that no more than 10% off-task time is tolerated. *Id.*

The ALJ then asked the VE whether there were available jobs under the hypothetical that were medium rather than light exertion. *Id.*. The VE stated that the jobs of coffee maker—32,121 jobs—and bagger—59,831 jobs—were both SVP 2 and medium exertion level and were available. *Id.* at 889. She also confirmed that these medium exertion jobs met the same criteria she had identified for the light exertion jobs. *Id.* at 890.

Plaintiff's counsel then asked the VE if the coffee maker job was consistent with the limitation of no kitchen work, and she testified that she had overlooked that and

[3] The transcript uses the word "modernly," but that appears to be a transcription error.

it would not be. *Id.* The ALJ asked her if there was an alternative job, and the VE identified a coin-operated laundry attendant job, with an SVP of 2, medium exertion, with 4,439 jobs. *Id.*

Finally, plaintiff's counsel asked the VE if there was any difference in the absenteeism and off-task time tolerances between the light and medium exertion jobs, and the VE said there were not. *Id.* at 891.

Plaintiff's counsel closed by saying that he believed that plaintiff's headaches alone would cause a degree of absenteeism that would preclude full-time employment. *Id.* The hearing then concluded.

On June 28, 2024, the ALJ issued an unfavorable decision finding that plaintiff was not disabled. Dkt. #3, pp. 21-40. The Appeals Council denied plaintiff's request for review, Dkt. #3, pp. 7-13, and this action followed.

## DISCUSSION AND ANALYSIS

### Legal Standards

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 496, 501 (2d Cir. 2009). If the evidence is susceptible to more than one rational interpretation, the

Commissioner's determination must be upheld. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).

To be disabled under the Social Security Act ("Act"), a claimant must establish an inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. § 416.905(a). The Commissioner must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920(a). At step one, the claimant must demonstrate that she is not engaging in substantial gainful activity. 20 C.F.R. § 416.920(b). At step two, the claimant must demonstrate that she has a severe impairment or combination of impairments that limits the claimant's ability to perform physical or mental work-related activities. 20 C.F.R. § 416.920(c). If the impairment meets or medically equals the criteria of a disabling impairment as set forth in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and satisfies the durational requirement, the claimant is entitled to disability benefits. 20 C.F.R. § 416.920(d). If the impairment does not meet the criteria of a disabling impairment, the Commissioner considers whether the claimant has sufficient RFC for the claimant to return to past relevant work. 20 C.F.R. § 416.920(e)-(f). If the claimant is unable to return to past relevant work, the burden of proof shifts to the Commissioner to demonstrate that the claimant could perform other jobs which exist in significant numbers

in the national economy, based on claimant's age, education, and work experience. 20 C.F.R. § 416.920(g).

Here, the ALJ made the following findings with regard to the five-step sequential evaluation: (1) plaintiff has not engaged in substantial gainful activity since February 6, 2020, the application date for Title XVI benefits; (2) plaintiff has the severe impairments of a seizure disorder caused by two past traumatic brain injuries and degenerative joint disease of the right arm; (3) plaintiff's impairments do not meet or medically equal any listed impairment; (4) plaintiff has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: he should not work at unprotected heights, or on dangerous machinery, tools, or chemicals; should not drive or work in a kitchen as part of his essential work functions; may not work above shoulder level with the right hand and arm, shoulder level defined as an imaginary disc that surrounds the neck, sits flat on the shoulders perpendicular to the spine and extends into infinity, that the plane above and below, so above that there may be no right hand reaching or work, and above that there may be continuous left reaching and work, below that no limitations bilaterally; and should not work in an environment with loud or sudden noises or yelling or any kind of higher level conflict; (5) plaintiff is unable to perform any past relevant work, but the ALJ expedited this finding given possible no substantial gainful activity within five years of his decision; (6) considering plaintiff's age, education, work experience, and RFC, he can perform jobs that exist in significant numbers in the national economy of routing clerk (117,393 jobs) and cashier II (467,033 jobs); and (7) plaintiff

was not, therefore, disabled within the meaning of the SSA from February 6, 2020, the date of the application was filed. Dkt. #3, pp. 27-33.

Pursuant to the *Revisions to Rules Regarding the Evaluation of Medical Evidence* ("*Revisions to Rules*"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), applicable to claims filed on or after March 27, 2017, the Commissioner is no longer required to afford any specific evidentiary weight to medical opinions, but is obligated to consider all medical opinions and evaluate their persuasiveness based on the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, with particular importance placed upon consistency and supportability. *Jacqueline L. v. Comm'r of Soc. Sec*, 515 F. Supp.3d 2, 7 (W.D.N.Y. 2021) (citing 20 C.F.R. § 416.920c(a) & (c)). To allow a reviewing court to trace the path of an ALJ's reasoning, an ALJ is required to explain their consideration of the supportability and consistency factors by pointing to specific evidence in the record to support the ALJ's findings regarding medical opinions. *Id.* (citing 20 C.F.R. § 416.920c(b)(2)).

With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the medical findings will be. *Id.* (citing 20 C.F.R. § 416.920c(c)(1)). Similarly, with respect to consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinions will be. *Id.* (citing 20 C.F.R. § 416.920c(c)(2)).

Supportability focuses on the fit between medical opinion offered by the source and the underlying evidence presented by the source to support that opinion, while consistency focuses on how well a medical source opinion is supported by the entire record. *Rosario v. Comm'r of Soc. Sec*, 20 Civ. 7749, 2022 WL 819810, at *8 (S.D.N.Y. Mar. 18, 2022). "Even though ALJs are no longer directed to afford controlling weight to treating source opinions – no matter how well supported and consistent with the record they may be – the regulations still recognize the 'foundational nature' of the observations of treating sources, and 'consistency with those observations is a factor in determining the value of No. 2:19-cv-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)) (alteration in original).

**<u>Challenges to the ALJ's Decision</u>**

Plaintiff makes two challenges to the ALJ's decision: (1) he failed to comply with Social Security Ruling ("SSR") 24-3p; and (2) he failed to properly evaluate plaintiff's headaches.

***Social Security Ruling 24-3p***

"At step five, the Commissioner considers a claimant's RFC, age, education, and work experience to see if a claimant can make an adjustment to other work." *Jennifer S. v. Comm'r*, 24-CV-334-LJV, 2026 WL 98423, at *6 (W.D.N.Y. Jan. 14, 2026) (citation and internal quotation marks omitted) (cleaned up). "In doing so, the Commissioner bears the burden of showing that, given those factors, there are a significant number of jobs in the national economy that a claimant can perform." *Id.*

To carry this burden, the Commissioner may either apply the Medical Vocational Guidelines or "adduce the testimony of a vocational expert." *Id.* The Second Circuit Court of Appeals "does not require a detailed scrutiny of a vocational expert's methods." *Id.* "Rather, a vocational expert's methodology is reviewed under a substantial evidence standard," and "the threshold to meet that standard is not high." *Id.*

On December 6, 2024, the SSA issued SSR 24-3p, titled "Use of Occupational Information and Vocational Specialist and Vocational Evidence in Disability Determinations and Decisions," with an effective date of January 6, 2025. SSR-24-3p, 2024 WL 5256890.

SSR4-3p rescinded and replaced SSR 004-4p, which had required an ALJ to identify and resolve any conflicts between a VE's testimony and the DOT. *Id.* at *2. While stating that the SSA continues to recognize the DOT as a reliable source of occupational information, SSR4-3p acknowledges that "the recent federal statistical data relating to work in the national economy uses the Standard Occupational Classification ("SOC") system, developed by the Office of Management and Budget in the 1980s and 1990s. *Id.*

The ruling further explains that the SSA does "not want to discourage use of occupational information that is reliable and commonly used in the vocational profession." *Id.* at *2. Thus, VEs "may provide evidence based on their professional experience and *any reliable source of occupational information that is commonly used in*

*the vocational profession* and relevant under our rules." *Id.* at *4 (emphasis added). VEs are expected "to identify the sources of the data they use and, where applicable, to explain their general approach to estimating job numbers." *Id.* Further, because VEs "are impartial and qualified professionals whom we consult because of their expertise, a more detailed inquiry into the sources of data or approaches used is not usually required." *Id.*

This ruling also emphasizes that, where the claimant is represented at the hearing level, "we expect the representative to raise any relevant questions or challenges about the VE's testimony at the time of the hearing and to assist in developing the record through appropriate questions to the VE." *Id.*

In addition, the VE "may cite to multiple acceptable sources of occupational data that do not precisely correspond to each other." *Id.* at *5. For example, the SOC aggregates occupational data at a higher level than does the DOT, which does not provide estimated job numbers in the national economy. *Id.* The ruling further provides that VEs may rely on occupational sources that use the SOC system, including the Occupational Employment and Wage Statistics ("OEWS") and the Occupational Requirements Survey ("ORS"). *Id.*

SSR 24-3p is also clear that a VE may cite occupations from the DOT but derive estimates of job numbers from an SOC-based data set when providing evidence during the hearing process. *Id.* However, because the DOT uses a "different classification taxonomy from the SOC system," a VE "would need to explain the general approach of

how they compare the DOT data to the data about estimates of job numbers" in the SOC-based system. *Id.*

One means for a VE to reconcile the SOC-based data with the DOT job classifications is by using a software program called Job Browser Pro, produced by a company called SkillTRAN. *Debiase v. Saul*, 3:19 CV 68 (RMS), 2019 WL 5485269, at *11 (D. Conn. Oct. 25, 2019). "SkillTRAN is a database that derives data from the Bureau of Census—Current Population Survey and Bureau of Labor Statistic[s]—Occupational Employment Survey and National Long Term Employment Projections." *Id.* (citation omitted). SkillTRAN cross references the 12,761 DOT occupations and codes to other industry data, and its Job Browser Pro software, "acts like a spreadsheet template to perform appropriate simple calculations based on a selected DOT occupation." *Id. See also Pamela M. H. v. Comm'r of Soc. Sec.*, No. 5:23-CV-00197 (AMN/CFH), 2024 WL 1468906, at *7, n.11 (N.D.N.Y. Feb. 22, 2024) (Job Browser Pro "is a software tool for disability management and legal professionals in many settings, including. . .expert testimony [and] disability claims management.") (citation omitted).

As the Seventh Circuit Court of Appeals has explained:

> The Social Security Administration uses the DOT to categorize occupations. . . Once a vocational expert determines the types of occupations in which a claimant can work, the expert provides the corresponding DOT number. . . *But the DOT does not provide job numbers for each occupation. So vocational experts convert job numbers from the Bureau of Labor Statistics—which uses the SOC system—to the DOT system. There are widely used, commercially available resources that help with this conversion. One is the Job Browser Pro software.*

*Chavez v. O'Malley*, 96 F.th 1016, 1022 (7th Cir. 2024) (citations omitted) (emphasis added).

Courts within the Second Circuit "have deemed SkillTRAN and Job Browser Pro as sources that provide reliable and sufficient evidence to support a VE's opinion about the number of jobs available in the national economy." *Matthew F. v. Bisignano*, 3:25-CV-894 (SVN), 2026 WL 3135945, at *3 (D. Conn. Oct. 10, 2026) (citation and internal quotation marks omitted). *See also Sara C. v. Comm'r of Soc. Sec.*, Civil No. 3:25-cv-626(RAR), 2026 WL 2836364, at *12-13 (D. Conn. Sept. 9, 22, 2026) (rejecting step-five challenge where ALJ found reliable VE's testimony about number of jobs in the national economy based on Job Browser Pro data); *Tarik v. Comm'r of Soc. Sec.*, CIVIL ACTION NO.: 24 Civ. 10032 (SLC), 2026 WL 381801, at *11 (S.D.N.Y. Feb. 11, 2026) (VE's testimony regarding job numbers based on SkillTRAN database and Job Browser Pro software constituted substantial evidence); *Candice J. v. Comm'r of Soc. Sec.*, 5:22-CV-0902, 2023 WL 5739364, at *10 (N.D.N.Y. Sept. 6, 2023) (substantial evidence supported VE's testimony regarding job numbers where VE derived numbers from Job Browser Pro); *Herrera v. Comm'r of Soc. Sec.*, 20-CV-7910 (KHP), 2021 WL 4909955, at *8 (S.D.N.Y. Oct. 21, 2021) (VE reasonably relied on data from SkillTRAN, which constituted substantial evidence); *Dennison v. Berryhill*, 17-CV-1059F, 2019 WL 2088506, at *9 (W.D.N.Y. May 13, 2019) (substantial evidence supported ALJ's reliance on VE's testimony; VE confirmed that her testimony was not in conflict with DOT, and "she also relied on Job Browser Pro software by SkillTRAN, a comprehensive information database used by vocational counselors, in arriving at the number of each of the three jobs available

in the national economy”); *Bailey v. Colvin*, No. 1:15-CV-00991 (MAT), 2017 WL 149793, at *4 (W.D.N.Y. Jan. 14, 2017) (ALJ did not err in relying on VE’s testimony regarding job numbers based on estimate obtained using Job Browser Pro; VE stated estimates were within specific DOT codes cited).

Here, plaintiff argues that the VE’s testimony cannot be substantial evidence as to job numbers because she did not explain the methodology used and “merely used the numbers she was given” by Job Browser Pro. Dkt. #6-1, p. 14. This argument is contrary to Second Circuit authority.

In *Sara C.*, for example, the plaintiff made essentially the same argument: “the ALJ erred because he relied on VE testimony that did not include a proper explanation of the methodology used” because the VE, on examination by plaintiff’s counsel, “was unable to explain how Job Browser Pro arrived at its figures.” *Sara C.*, 2026 WL 2836364, at *12. The Court rejected this argument, holding that the ALJ properly found the VE’s testimony reliable because he relied on “administratively recognized sources” which are “commonly used” and “professionally recognized.” *Id.* at 13.

The ALJ here employed similar reasoning, fully acknowledging the requirements of SSR 24-3p:

> The vocational expert testified that she used a program called Job Browser Pro which obtains the numbers from the Department of Labor Statistics. She said that she used DOT specific number[s] for full time jobs only and that she did not manipulate the numbers. The vocational expert testified that

> the sources she used are those customarily used by vocational experts.
>
> . . .
>
> *Pursuant to SSR 24-3p, I have determined that the vocational expert's testimony relied upon appropriate data sources when determining specific occupations/jobs and computing numbers of the aforementioned jobs that such an individual could perform predicated upon the claimant's vocational profile and assessed residual functional capacity with such data sources as set forth above. Accordingly, for the reasons described above, the vocational expert's testimony is accepted in accordance with SSR 24-3p.*

Dkt. #3, p. 861 (emphasis added).

The ALJ thus did not err in relying on the VE's testimony regarding the job numbers she obtained through Job Browser Pro. *See also Jennifer S.,* 2026 WL 98423, at *6 (rejecting plaintiff's argument that VE's testimony regarding job numbers by using, *inter alia*, vocational software was "suspect;" noting "the Second Circuit does not require a detailed scrutiny of a vocational expert's methods") (citation and internal quotation marks omitted).

Moreover, plaintiff's argument that the ALJ erred because the VE did not explain the methodology behind Job Browser Pro rings hollow because his counsel never asked her about it. As noted above, SSR 24-3p specifically contemplates that, where a claimant is represented at the administrative hearing, the representative should raise any relevant questions or challenges about the VE's testimony at that time. SSR 24-3p, 2024 WL 5256890, at *4. *See also Jennifer S.*, 2026 WL 98423, at *7 ("What is more, Jennifer

was represented by counsel at the hearing, and counsel did not raise the issue before the ALJ.").

Despite the numerous cases cited above, plaintiff states that his "counsel has not been able to locate caselaw on this specific issue from our Circuit." Dkt. #6-1, at p. 16. Plaintiff then cites *Christopher G. v. Bisignano*, No. 23 C 2197, 2025 WL 2108540 (N.D. Ill. July 28, 2025). However, plaintiff's reliance on that case is unavailing.

First, the Court there noted that the Court of Appeals for the Seventh Circuit had not endorsed Job Browser Pro as *per se* reliable, and that courts within the Seventh Circuit require ALJs to obtain additional indicia of reliability before relying on a VE's testimony about job numbers obtained from this software. *Id.* at *5. As noted above, courts within the Second Circuit do not require such additional measures. *See also Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) (rejecting argument that ALJ erred at step five because VE was unable to specify how he arrived at job numbers; it was sufficient that VE "identified the sources he generally consulted to determine such figures"); *Bradley v. Berryhill*, No. 3:16-cv01478(JAM), 2017 WL 3314000, at *4 (D. Conn. Aug. 3, 2017) (finding no error in ALJ's failure to scrutinize VE's methodology regarding job numbers; VE's identification of general sources of numbers, coupled with ALJ's conclusion that VE had expertise in field of vocational studies, "was enough to entitle the ALJ to accept the VE's testimony").[4]

---

[4] Since *Christopher G.*, the Seventh Circuit Court of Appeals has approved an otherwise-qualified VE's reliance on Job Browser Pro in determining job numbers. *Chavez*, 96 F.4th at 1023-1025.

Second, in *Christopher G.*, the Court reasoned that the VE did not "cogently and thoroughly explain his methodology of relying on Job Browser Pro's full-time percentages *after direct challenge by Claimant*." *Christopher G.*, 2025 WL 2108540, at *5 (emphasis added). Here, plaintiff's counsel asked no questions of the VE regarding her use of Job Browser Pro.

For these reasons, the Court concludes that the ALJ did not err at step five of the sequential analysis by relying on the VE's testimony regarding available job numbers.[5]

***Evaluation of Plaintiff's Headaches***

Plaintiff next argues that the ALJ erred in "completely" discounting plaintiff's testimony regarding the severity of his headaches and by failing to include in the RFC limitations posed by absences or off-task time caused by headache symptoms. The Court disagrees.

**<u>Applicable Legal Principles</u>**

"At step two of the disability analysis, the ALJ determines whether the claimant has an impairment, or combination of impairments, that is 'severe' within the

[5] Strangely, despite acknowledging that SSR 24-3p rescinded SSR 004-p—thereby eliminating the requirement that an ALJ identify and resolve conflicts between occupational information provided by a VE and the DOT—plaintiff nonetheless argues that the ALJ erred in not resolving a conflict regarding limitations in plaintiff's use of his right arm. Dkt. #6-1, p. 15. However, as the ALJ correctly noted, SSR 24-3p was in effect at the time he issued his decision, and he was thus not required to question the VE on this matter. Dkt. #3, p. 846. Moreover, the VE did address and explain why there was, in fact, no conflict. *Id.* at 888.

meaning of the Act, in that it imposes significant restrictions on the claimant's ability to perform basic work activities." *Sarah Ann Z. v. Comm'r of Soc. Sec.*, 1:24-CV-00859 EAW, 2026 WL 2906489, at *3 (W.D.N.Y. Sept. 28, 2026) (citing 20 C.F.R. § 416.920(c)). "The claimant bears the burden of presenting evidence establishing severity," although this requirement "is *de minimis* and is only meant to screen out the weakest of claims." *Id.* (citation and internal quotation marks omitted).

Nonetheless, "the mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a condition severe." *Id.* "However, any error at step two is rendered harmless when the ALJ finds that a claimant has other severe impairments and proceeds through the later steps of the sequential analysis." *Id.*

Further, "an RFC determination must account for limitations imposed by both severe and non-severe impairments." *Id.* (cleaned up). "But the law only requires that ALJ to *evaluate* non-severe impairments in the RFC analysis, not to include limitations in the RFC." *Id.* "To hold otherwise would defy logic: *requiring* an ALJ to limit a claimant's ability to work due to a non-severe impairment suggests that the non-severe impairment causes significant work limitations, which runs counter to the non-severity finding." *Id.*

"A claimant's subjective complaints are an important element in the adjudication of [Social Security] claims, and must be thoroughly considered in calculating

the RFC of a claimant." *Ann L. A. v. Comm'r of Soc. Sec.*, CASE NO. 6:25-cv-06198, at *6 (W.D.N.Y. Sept. 24, 2026) (citations and internal quotation marks omitted). However, "an ALJ is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence of record." *Id.*

An ALJ must employ a two-step analysis in evaluating the claimant's alleged symptoms. *Id.* "First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments could reasonably be expected to produce the pain or other symptoms alleged." *Id.* "Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit a plaintiff's ability to work." *Id.*

"When a claimant reports symptoms that are more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider" various factors: "(1) an individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and

restrictions due to pain or other symptoms." *Tarik*, 2026 WL 381801, at *5 (citations omitted).

The Court "must uphold the ALJ's decision to discount a [plaintiff's] subjective complaints of pain if the finding is supported by substantial evidence. It is the function of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses," including the plaintiff. *Ann L. A.*, 2026 WL 2873945, at *7 (citations and internal quotation marks omitted).

**The ALJ's Analysis**

First, at step two of his analysis, the ALJ determined that plaintiff's headaches were non-severe because they would have no more than a minimal effect on his ability to work. Dkt. #3, p. 849.

The ALJ noted that the medical records reflected that plaintiff was diagnosed with headaches after being struck in the head by a ski lift at work in February 2018. Dkt. #3, pp. 346, 849. Plaintiff was evaluated by neurology in November 2018, at which time he was prescribed 750 mg. of Depakote twice daily. Dkt. #3, p. 343. The ALJ noted that, after that time, plaintiff reported significant improvement in his headaches:

- On February 5, 2019, plaintiff reported to his neurologist that "the medication seems to be working;" he denied any crippling headaches; and overall "he states that his headaches are "good";
- On April 16, 2019, plaintiff reported a 75-80% improvement in his headaches; that they had diminished in intensity with the medication; that the medication allowed him to function "and at times he even forgets that he has [a] headache." The neurologist noted that plaintiff was

"neurologically stable" and released him to return to work with a no-driving restriction due to his history of seizures;

- Plaintiff reported no headaches in October 2019 and January 2020;[6] and

- There was no evidence that plaintiff had ever needed emergency room treatment for his headaches.

Dkt. #3, p. 849.[7]

The ALJ then considered the hearing testimony of Dr. Haynes, the neurological medical expert. *Id.* Dr. Haynes noted that his review of the record reflected that plaintiff's headaches are non-intractable, intermittent, and that plaintiff often reported no headaches. *Id. See* Dkt. #3, pp. 710, 717; Dkt. #4, pp. 143, 144, 152. Dr. Haynes also noted that plaintiff had not seen his neurologists during a four-year gap from February 2020 to October 2024. Dkt. #3, p. 849.

Moving on to the RFC, the ALJ noted that he considered all impairments, including those that were non-severe, in reaching the RFC. Dkt. #3, p. 851. The ALJ specifically recounted plaintiff's testimony regarding the nature and symptoms of his headaches. Dkt. #3, p. 853. However, the ALJ concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Dkt. #3, p. 854.

---

[6] The ALJ stated the first report as being from September 2019, but this appears to be a scrivener's error as the cited medical record is dated October 22, 2019. Dkt. #3, p. 346.

[7] Plaintiff cites to a medical record from August 2018 in which plaintiff reported very bad symptoms from his headaches, but that record pre-dates his prescription for Depakote. Dkt. #3

In support of this determination, the ALJ again referenced Dr. Haynes's testimony, which he found very persuasive given Dr. Haynes's expertise as a highly qualified neurologist, as well as the fact that he had the opportunity to review the entire medical record. Dkt. #3, pp. 854, 856, 858. Dr. Haynes opined that plaintiff's headaches were controlled with "a mild treatment regimen." *Id.* at 854. The ALJ also again referenced the treatment notes showing that plaintiff reported to his physicians that his headaches were controlled and significantly improved with medication, and that his neurologist had released him to return to work. *Id.* at 855-857.[8]

The ALJ also considered the report of consultative examiner, Dr. John Schwab, who examined plaintiff on September 25, 2020. Dkt. #3, p. 857. Dr. Schwab listed headaches among his diagnoses of plaintiff, but his medical source statement restricted plaintiff only from driving vehicles; avoiding heights, ladders, and moving machinery; and not raising his right arm above shoulder height. Dkt. #3, p. 625.

The ALJ then turned to other medical expert records, noting that state agency examiner, Dr. V. Baronos, opined in February 2021 that plaintiff's headaches were non-severe. Dkt. #3, pp. 95, 857.

[8] The ALJ also alluded to a Function Report that plaintiff submitted in support of his application in April 2020, although the ALJ did not discuss it. However, in that report, plaintiff responded to a question asking how often he experienced pain by stating: "In [the] beginning, quit (*sic*) often, now as long as I take my meds, I'm good." Dkt. #3, p. 274.

In finding "not persuasive" the opinion of Kenneth Osborn, a PA who had treated plaintiff, the ALJ again explained that the record reflected that plaintiff's headaches were controlled with "only conservative treatment." Dkt. #3, p. 858.

Given this analysis, plaintiff's argument that the ALJ improperly rejected plaintiff's claim for lack of "corroborating" evidence is without merit. Dkt. #6-1, pp. 17-18. In substance, the ALJ simply found that plaintiff's testimony regarding the severity of his symptoms was inconsistent with his medical records and other evidence in the record, and plaintiff's argument, in effect, asks the Court to reweigh that evidence and reach a different conclusion. "That is not the Court's role." *David. J. O. v. Comm'r of Soc. Sec.*, 25 Civ. 3486 (CS)(JCM), 2026 WL 2475283, at *17 (S.D.N.Y. Aug. 24, 2026). *See also id.* ("The ALJ, therefore, articulated specific reasons, supported by substantial evidence, for discounting the alleged severity of Plaintiff's symptoms.") (citations omitted).

Finally, it is well established that an ALJ's credibility findings "are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Joshua C. v. Bisignano*, Civil No. 3:25-cv-01190 (TOF), 2026 WL 2056950, at *10 (D. Conn. July 16, 2026) (citations and internal quotation marks omitted). Plaintiff has made no such showing, and remand is thus not warranted.

**CONCLUSION**

Based on the foregoing, plaintiff's motion for judgment on the pleadings (Dkt. #6) is denied, and the Commissioner's motion for judgment on the pleadings (Dkt. #9) is granted.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

DATED: Buffalo, New York

November 3, 2026

**s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**